[Cite as *In re C.D.*, 2012-Ohio-4494.]

STATE OF OHIO, HARRISON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | CASE NO. 11 HA 5 |
| C.D., MINOR CHILD. | ) | |
| | ) | |
| | ) | |
| DANNIELLE STITT, | ) | |
| | ) | OPINION |
|     PLAINTIFF-APPELLANT, | ) | |
| | ) | |
|     - VS - | ) | |
| | ) | |
| JAMIE DAUGHERTY, | ) | |
| | ) | |
|     DEFENDANT-APPELLEE. | ) | |

CHARACTER OF PROCEEDINGS:    Civil Appeal from Common Pleas
Court, Juvenile Division,
Case No. 04 H 212.

JUDGMENT:    Affirmed.

APPEARANCES:
For Plaintiff-Appellant:    Attorney David Heier
338 South High Street
Columbus, OH 43215

For Defendant-Appellee:    Attorney Mary Corabi
424 Market Street
Steubenville, OH 43952

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite
Hon. Joseph J. Vukovich

Dated: September 20, 2012

DeGenaro, J.

{¶1} Plaintiff-Appellant, Dannielle Stitt, appeals the decision of the Harrison County Court of Common Pleas, Juvenile Division, granting a motion for reallocation of parental rights and responsibilities filed by the minor child's father, Defendant-Appellee, Jamie Daugherty. On appeal, Stitt first alleges that because Daugherty is unavailable to care for the minor child during the week, a non-parent, Daugherty's wife, has become the de facto custodial parent in violation of Stitt's rights. Second, Stitt argues that the trial court erred by announcing its intention to interview the minor child after the commencement of the trial, thereby depriving Stitt of a meaningful opportunity to request a guardian ad litem. Third, Stitt contends the trial court abused its discretion in finding a change of circumstances. Finally, she argues that the trial court's decision to grant the change of custody was an abuse of discretion.

{¶2} Stitt's arguments are meritless. The trial court granted custody to Daugherty, the child's father, and Stitt has not provided any caselaw to support her argument that the stepmother has become the de facto custodial parent. A review of the record reveals that Stitt had a sufficient opportunity to request a guardian ad litem, but she failed to do so. Furthermore, the trial court did not abuse its discretion in finding a change of circumstances had occurred. Finally, the trial court did not err in reallocating custody; the trial court's judgment was well-reasoned and supported by competent, credible evidence. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶3} Stitt and Daugherty were never married, but have one minor daughter together, C.D., who was born June 12, 2003. On December 8, 2004, the trial court issued a judgment entry designating Stitt as residential parent of C.D. The court granted Daugherty parenting time, every weekend and every Wednesday from 9:00 a.m. to 6:00 p.m.

{¶4} On November 4, 2010, Daugherty filed a motion for reallocation of parental rights and responsibilities, requesting that the court designate him as the residential parent and legal custodian. He alleged that a change in circumstances had occurred, asserting that Stitt has had numerous men living in her residence, and that C.D.'s grades

and C.D.'s personal hygiene had deteriorated. On March 14, 2011, the matter came before the trial court for a hearing.

**{¶5}** Daugherty began his case-in-chief with cross-examination of Stitt. Stitt testified that she is 28 years old, is currently unemployed and attending college online. She lives with C.D. and C.D.'s half brother, and sometimes her mother lives with them when she is not residing in Florida. She is dating a 19 year old man named Matthew. From 2004 through 2008, a boyfriend lived with her and C.D., and then her son's father lived with them for approximately a year between 2008 and 2009. She also testified that there had been no problems with visitation. Daugherty's Wednesday visitation stopped once C.D. started school, but she still allowed C.D. to go to Daugherty's house on some Wednesdays. She also allowed C.D. to visit her paternal grandmother frequently. Stitt testified that Daugherty is a "wonderful" father and that his wife, Rhonda, is a good step-mother.

**{¶6}** Stitt testified that C.D. was in kindergarten for two years and it was her decision for C.D. to repeat kindergarten. In her second year of kindergarten, from September 18, 2009 through March 2, 2010, C.D. was absent from school 20 times and tardy twice. Stitt does not have a vehicle, but she denied this was the reason C.D. was late for school and explained that C.D. had missed the bus. Stitt agreed that she relied on other people to take and pick up C.D. from the bus stop.

**{¶7}** For the current school year in first grade, C.D.'s grades in Math, Reading, and Spelling were, respectively: first grading period – F, D, D; second grading period – D, D, B; third grading period – F, D, D. Stitt testified that she obtained a tutor for C.D. after the first grading period, but Daugherty did not think there was a need for a tutor. She said that she discontinued the tutoring when the custody case began but that she was going to begin the tutoring again that month. Stitt also testified that she helps C.D. with her homework every night. The school recently had an Intervention Assistance Team (IAT) meeting, but Stitt did not attend because she was ill and she sent a note to the school in advance that she could not attend.

**{¶8}** Stitt confirmed that she has not volunteered at C.D.'s school. C.D. played

baseball in summer 2010, and Daugherty and Rhonda took C.D. to practices. Stitt agreed that sometimes Rhonda would also take her to practices or to the games. She also admitted that sometimes she would call either Rhonda or Daugherty to obtain medicine for C.D. Stitt testified that C.D. has had head lice on more than one occasion, including before she started school.

**{¶9}** Next, Christy Sommers, C.D.'s first grade teacher, testified. She explained that the school held parent-teacher conferences in November and sent notices to all the parents. Stitt did not reply to the notice nor did she attend the conference. Stitt came in later on, and Sommers told Stitt that C.D. had trouble focusing and that she was concerned C.D. might have ADD. Stitt told her that C.D. had a doctor's appointment the following week and she would check on the focusing issues. Sommers never heard back from Stitt regarding the doctor's appointment. Sommers also discussed the focusing problems with Daugherty and his response was that C.D. needs any help that she can get.

**{¶10}** In November 2010, Sommers sent home worksheets to Stitt with a note explaining that C.D. was having problems staying focused and suggesting extra practice with the worksheets. Sommers explained that Daugherty came to see her the following week wondering why C.D. had 17 pages of homework to do over the weekend. Between September 2010 and March 2011, Sommers sent home 29 notes to Stitt regarding behavioral issues, including C.D. having trouble focusing. Sommers stated that C.D. is in danger of failing in school.

**{¶11}** Regarding the IAT meeting in January, Sommers explained that the purpose of the IAT process is to assist children who are struggling in school and to determine whether a special needs placement is necessary. Stitt did not notify Sommers that she was not going to attend this meeting. Sommers testified that in the past two weeks, Stitt requested a conference. Stitt brought her boyfriend and a male friend with her to the conference. The boyfriend took over the conference. When they began discussing the focusing issues, the boyfriend stated that he attended college and could not do first-grade math either.

**{¶12}** Sommers described C.D.'s appearance as "kind of shabby" on some days. Sommers also testified that Stitt was assigned to help with a school party, but she did not do so. Rhonda helped with three school parties. When asked which parent seems more concerned about C.D., Sommers stated that Daugherty seems very concerned about what can be done for C.D.

**{¶13}** On cross, Sommers explained that she does not assign homework over the weekend. The worksheets she sent home with C.D. were supposed to be reviewed with the tutor, but Daugherty had worked with C.D. on them. Sommers explained that the assessment through the school to determine whether C.D. has ADD began after the conference two weeks ago. If the assessment reveals an ADD diagnosis, the next step is determined by the parents. The school will request that the child see a pediatrician for assessment and then usually a medication is prescribed. Sommers stated that Daugherty and Rhonda have contacted her regarding C.D.'s educational needs and have purchased study aids for her.

**{¶14}** The next two witnesses were Summer Campise and Amber Scuken, both childhood friends with Stitt. For a period of six to seven months that year, Campise had spent three nights per week at Stitt's residence. Scuken lived with Stitt for three or four months beginning in November 2009. Both women testified that Stitt's home was dirty. Further, both testified that there were periods while they lived with Stitt that her home did not have running water or heat and that she would use a space heater. Campise testified that men were there all the time. She recalled three different men at the house and said that two of them spent the night sometimes. On cross, both women admitted that they were currently subject to civil protection orders to stay at least 500 feet away from Stitt.

**{¶15}** Next, Bonnie Kutie testified that she has known Daugherty for 30 years. She described Daugherty and Rhonda's home as very clean. She testified that C.D. is well-adjusted to their home and they are very good parents. She had also seen C.D. interact with her paternal grandmother and stated they had a "wonderful" relationship.

**{¶16}** Carlotta Daugherty, Daugherty's mother, testified next. She described Daugherty and Rhonda's home as clean. She stated that Daugherty and Rhonda interact

very well with C.D. and she seems well-adjusted to their home. Carlotta sees C.D. frequently and some weeks she sees her everyday. She explained that C.D. will get home from school around 4:10 p.m., and then call her between 5:00 and 6:00 p.m. to come over to play. Carlotta will pick C.D. up and then take her back home in time to go to bed.

**{¶17}** Rhonda testified next for Daugherty. She and Daugherty were married in September 2007. She works at the Carriage Inn during the week from either 5:00 a.m. to 1:30 p.m. or 9:30 a.m. to 6:00 p.m., and she works every other weekend from 5:30 a.m. to 1:00 pm. She testified that Daugherty works at Oxford Mining on weekdays from 3:00 p.m. to 2:00 a.m. If the court granted custody to Daugherty, on days she works until 1:30 p.m., she will be there when C.D. comes home from school. When she works until 6:00 p.m., Carlotta can pick C.D. up from school.

**{¶18}** Rhonda explained that some Wednesdays, C.D. would come to her house afterschool and she would help C.D. with her homework. Rhonda described her relationship with C.D. as "pretty good" and explained that they do activities together such as bowling or going to the movies. She stated that C.D. seems adjusted to her home and has six or seven friends there.

**{¶19}** Next, Daugherty testified that if the court grants him custody, he will be able to get C.D. ready for the bus in the mornings. He has helped her get ready in the mornings before, after working until 2:00 a.m. He attended the parent-teacher conference in November and the ITA meeting. He explained that he and Rhonda work with C.D. on the weekends on her homework. If he becomes residential parent, he hopes to improve C.D.'s grades and would continue to assist her with homework. C.D. would continue to attend the same school.

**{¶20}** Daugherty testified that when he receives visitation with C.D., her clothes are clean half the time and sometimes her hair is a little dirty. He said that he and C.D. mow the grass together and play with toys. He and Rhonda have taken C.D. on vacation to North Carolina and have also taken her to water parks and roller skating. He attended two of C.D.'s baseball games but was unable to attend the others due to his work

schedule. His brother and both of his parents have a relationship with C.D. He stated that C.D. has her own room in his house and seems well-adjusted there. He explained that he wants custody of C.D. because she would be clean everyday, would get more rest, and would be more focused at school.

**{¶21}** On cross, Daugherty testified that he does not know what doctor or dentist C.D. sees. He has asked Stitt to make dental appointments because C.D. has a noticeable hole in one of her teeth. He later testified that C.D. has had the hole for approximately one year. He also testified that he asked Stitt if he could take C.D. to a dentist in Freeport a year ago, but Stitt did not respond.

**{¶22}** Daugherty told Stitt that he did not believe C.D. needed a tutor because Stitt was available five days a week and should be able to assist her with first-grade level homework. He asked Sommers about the 17 pages of worksheets that were sent home because he thought it was too much homework for a first grader to do over a weekend. Daugherty agreed that C.D.'s grades are not improving despite the help she receives at his house, although he explained that they are only able to help her two days a week.

**{¶23}** Heather Fulton testified as Daugherty's last witness. She lived with Stitt in the end of November 2008 through February or March 2009. She explained that the home was not clean when she moved in and she did most of the cleaning while living there. C.D.'s room was not clean most of the time. At one point, Stitt ran out of propane for heat and used space heaters for a week. There was also an issue with a leak in the water tank and the home did not have running water for a "couple" of weeks. She thought that C.D. and Stitt interacted well when Stitt was there.

**{¶24}** Daugherty then rested, and the court admitted his exhibits.

**{¶25}** Matthew Reppart, Stitt's boyfriend, testified first for Stitt. He is enlisted in the United States Army and has been in a relationship with Stitt for three months. He testified that Stitt plays with C.D. and works with her on her homework. He also stated that Stitt cleans her house. On cross, Reppart testified that he is at Stitt's house almost every day from early morning until late evening. Counsel asked Reppart if he recently yelled at C.D.'s bus driver and told him that he was her dad. Reppart denied he said that

and stated that he asked the bus driver why he told C.D.'s teacher that she was unruly and needed detention. When asked if Reppart talked to Daugherty about it, he replied, "Why would I talk to him?"

**{¶26}** Next, Courtney Gardner testified that she is good friends with Stitt and she drives C.D. to and from the bus stop. She testified that she stops at Stitt's house a couple times a week and stated that Stitt interacts very well with C.D. and helps C.D. with her homework. On cross, Gardner testified that when she picks up C.D. from the bus stop after school, she usually drops C.D. off and does not go into her home.

**{¶27}** Stitt testified last. She explained that she obtained civil protection orders against Campise and Scuken because she received threatening phone calls from them and they came to her home and threatened her. She refuted the testimony about the issues with heat or water and explained that she did have a water leak at one point but that she had it fixed within four days. She was living in her current residence in 2004 when she and Daugherty entered into the visitation agreement. Stitt also testified that C.D. has a strong relationship with her younger brother.

**{¶28}** Stitt testified that when she met with Sommers in November, Sommers told her C.D. might have ADD. She told Sommers that C.D. had a doctor's appointment but the appointment was not for ADD testing, it was a regular checkup. She then met with Sommers in late January or early February and they decided to move forward with the IAT paperwork. When asked if she intended to take C.D. to the doctor for ADD assessment, Stitt replied that she did not think C.D. has ADD and that any typical seven year old has problems with focusing. However, she stated that if the school believes C.D. has ADD, then she would take her to the doctor.

**{¶29}** Regarding C.D.'s dental issues, Stitt testified that C.D. had a dental appointment in February because Stitt noticed a hole in her tooth. Stitt explained that C.D. has "quite a few" cavities caused by all the sugar she consumes. C.D. is on a waitlist now to see a specialist to have her teeth filled and capped. Stitt denied that Daugherty asked if he could take C.D. to the dentist. She testified that she takes C.D. to the dentist for regular checkups.

{¶30} Stitt testified that she cleans her home everyday and she washes C.D.'s clothing regularly. She missed the November parent-teacher conference because her son was sick and she did not have a babysitter. She also explained that when Sommers sent home behavioral reports, she reviewed them and discussed the notes that were not repetitive with C.D.

{¶31} On cross, Stitt agreed that Daugherty told her about the hole in C.D.'s tooth around a year ago and claimed that she took C.D. to the dentist a week or two later. Stitt explained that the tooth is a baby tooth and the dentist did not do anything about it. Then when she took C.D. to the appointment in February, the dentist told her that C.D. needed to see the specialist. She also testified that after Sommers sent home notes on C.D.'s behavioral problems, she called Sommers numerous times to discuss the notes.

{¶32} The court then admitted Stitt's Exhibit A.

{¶33} On March 23, 2011, the trial court issued a judgment entry finding that there had been a change of circumstances under R.C. 3109.04(E)(1)(a) based on C.D.'s health, education, and household composition. The court then proceeded to a best interest analysis pursuant to R.C. 3109.04(F)(1) and applied R.C. 3109.04(E)(1)(a) to determine whether the harm likely to be caused by a change of residence is outweighed by the advantages of such a change. The court found that it is in the best interest of C.D. to designate Daugherty as residential parent and that the advantages of this change would outweigh the harm. Thus, the court granted Daugherty's motion for reallocation of parental rights and designated him as residential parent.

### De Facto Award of Custody to a Non-Parent

{¶34} In her first of four assignments of error, Stitt asserts:

{¶35} "The trial court erred by awarding custody to the father who is unavailable to care for the child thereby granting a de facto award of custody to a non-parent custodian in violation of mother's parental rights."

{¶36} Stitt argues that because Daugherty would not be able to spend time with C.D. on weekdays after she got home from school and Rhonda, the stepmother, would care for C.D. during these times, Rhonda has become the "de facto custodial parent."

Stitt notes that she is a stay at home mother and studies online, so she is available to care for C.D. during the week, whereas Daugherty is unavailable due to work.

**{¶37}** Daugherty did not testify that he was unavailable to care for C.D. except on the weekends. While he stated that during the school year, either Rhonda or Carlotta would pick up C.D. after school because he would be working, he would wake up in the mornings to help C.D. get ready for school. Furthermore, Carlotta testified that C.D. already spends many evenings after school at her house, and sometimes C.D. is at Carlotta's house five days per week.

**{¶38}** Stitt cites to two cases to support her argument that she, the natural parent, has paramount parenting rights over Rhonda, a non-parent: *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977) and *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971. However, neither case is applicable here. *In re Hockstok* concerned a custody action where the maternal grandparents were granted legal custody over the minor child and the natural mother filed a motion for reallocation of parental rights. *Id.* at ¶ 8-9. Similarly, *In re Perales* stemmed from a custody dispute between the natural mother and a nonparent. *Id.* at 90.

**{¶39}** The instant case did not involve a custody proceeding between a parent and a nonparent. The court granted custody of C.D. to Daugherty, the child's natural father. Moreover, Stitt cites to no case to support her contention that Rhonda became the de facto custodial parent because she would care for C.D. in the evenings after school. Accordingly, this assignment of error is meritless.

### Appointment of Guardian Ad Litem

**{¶40}** In her second assignment of error, Stitt argues:

**{¶41}** "The trial court erred by announcing to the parties after commencement of the trial of its intention to interview the child in camera thereby depriving appellant of the opportunity to request the appointment of a guardian ad litem."

**{¶42}** Stitt contends that she was denied the opportunity to meaningfully exercise her right to have a guardian ad litem (GAL) appointed. She argues that because the trial court announced its decision to interview C.D. during the trial, it failed to give her timely

notice of its intention to conduct the interview. She correctly contends that the plain error doctrine applies here, as she did not request the appointment of a GAL before the trial court nor did she object when the trial court announced its intention to perform an in-camera interview of C.D. *See In re Amber G. & Josie G.*, 6th Dist. No. L–04–1091, 2004-Ohio-5665, ¶ 6. Plain error is found in a civil case "only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 122-123, 679 N.E.2d 1099 (1997).

**{¶43}** Pursuant to R.C. 3109.04(B):

(1) When making the allocation of the parental rights and responsibilities for the care of the children * * * in any proceeding for modification of a prior order of the court making the allocation, the court shall take into account that which would be in the best interest of the children. In determining the child's best interest for purposes of making its allocation of the parental rights and responsibilities for the care of the child and for purposes of resolving any issues related to the making of that allocation, the court, in its discretion, may and, upon the request of either party, shall interview in chambers any or all of the involved children regarding their wishes and concerns with respect to the allocation.

(2) If the court interviews any child pursuant to division (B)(1) of this section, all of the following apply:

(a) The court, in its discretion, may and, upon the motion of either parent, shall appoint a guardian ad litem for the child.

**{¶44}** Here, the trial court exercised its discretion to perform an in-camera interview of C.D. It announced its intention to perform this interview at the close of the first day of trial. After discussing some scheduling issues, the court asked both parties' counsel if they had any questions or concerns and both responded that they did not.

Accordingly, Stitt did have an opportunity to request a GAL. When the court asked the parties if they had any concerns, Stitt's counsel could have made an oral motion for appointment of a GAL and requested time for the GAL to perform an independent investigation if necessary. Moreover, despite Stitt's arguments that the trial court did not give her adequate notice of the interview, R.C. 3109.04(B) does not provide that the court must give a certain amount of notice to the parties before it interviews the minor child.

{¶45} Stitt had sufficient opportunity to request a GAL be appointed, and the trial court did not commit plain error. Stitt's arguments regarding the trial court discounting C.D.'s desire to live with Stitt will be further addressed in the fourth assignment of error. Accordingly, this assignment of error is meritless.

### Change in Circumstances

{¶46} Stitt alleges in her third assignment of error:

{¶47} "The trial court's finding that there was a change in circumstances was an abuse of discretion and against the manifest weight of the evidence."

{¶48} A trial court has broad discretion in its determination of parental custody rights. *Booth v. Booth*, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989). Because custody issues are some of the most difficult and agonizing decisions a trial judge must make, he or she must have wide latitude in considering all the evidence and such a decision must not be reversed absent an abuse of discretion. *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). Therefore, a trial court's custody determination which is supported by competent and credible evidence should not be disturbed unless it constitutes an abuse of discretion. *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23, 550 N.E.2d 178 (1990); *Rohrbaugh v. Rohrbaugh*, 136 Ohio App.3d 599, 603, 737 N.E.2d 551 (7th Dist.2000).

{¶49} With respect to this Court's duty of deference to the trial court in custody determinations, the Ohio Supreme Court instructed:

> The discretion which a trial court enjoys in custody matters should be
> accorded the utmost respect, given the nature of the proceeding and the

impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. (Citations omitted.) *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶50} R.C. 3109.04(E)(1)(a) governs modification of an existing court order allocating parental rights and responsibilities, and states:

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * *, unless a modification is in the best interest of the child and one of the following applies: * * *

(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."

{¶51} Therefore, there are three steps that must be satisfied before a trial court can properly modify an existing decree to reallocate residential parental status: "(1) there must be an initial showing of a change in circumstances, (2) if circumstances have changed, the modification of custody must be in the children's best interests, and, (3) any harm to the children from a modification of the plan must be outweighed by the benefits of

such a modification." *In re Dissolution of Marriage of Kelly*, 7th Dist. No. 09 CA 863, 2011-Ohio-2642, ¶ 28. "Additionally, R.C. 3109.04(E)(1)(a) creates a rebuttable presumption that retaining the residential parent designated by the prior decree is in the child's best interest." *Rohrbaugh* at 604.

**{¶52}** This court has previously noted that although R.C. 3109.04 does not set forth a definition of the phrase "change in circumstances", Ohio courts have generally held that the phrase is intended to denote "an event occurrence, or situation which has a material and adverse effect upon a child." *Id.* at 604-605., citing *Wyss v. Wyss*, 3 Ohio App.3d 412, 445 N.E.2d 1153 (10th Dist.1982).

**{¶53}** The trial court found a change of circumstances based on C.D.'s health, education, and household composition. First, as to C.D.'s health, the court noted that there was uncontroverted evidence in the record that C.D.'s dentist referred her to a dental specialist due to the amount of cavities in her teeth. Due to this prognosis, the trial court did not believe Stitt's testimony that she took C.D. to regular dental appointments. The court also noted that the school initially recommended that C.D. be tested for ADD in November 2010 and Stitt refused to comply until two weeks ago. The court noted that Stitt initially testified that she did not believe that C.D. had ADD, but later conceded that because the school believed it was best, she signed the paperwork for the school to begin testing.

**{¶54}** Stitt claims that the trial court's finding regarding the dental issues related to a hole in a baby tooth, which would not have any consequential effect on C.D.'s health. However, the evidence in the record demonstrates that the dental issues did have a material effect on C.D. Stitt's own testimony showed that C.D. has had "quite a few cavities" and that her dentist referred them to a specialist to cap and fill C.D.'s teeth. Stitt further argues that Daugherty lacked involvement in C.D.'s medical and dental care, whereas Stitt was the parent who took C.D. to medical and dental appointments. However, the trial court specifically noted that it did not believe Stitt's testimony. The trial court had the opportunity to observe Stitt's testimony and demeanor and was in the best position to make such a credibility determination. *Rohrbaugh* at 607.

**{¶55}** Regarding the school's recommendation that C.D. be tested for ADD, Stitt focuses on Sommers's testimony that when a child is diagnosed with ADD, the pediatrician usually prescribes medication. Stitt argues that prescribing such medication to a young child may be dangerous and parents may feel pressured by school authorities to administer medicine to their children despite their apprehensions on the safety of the medicine. However, no medication had been prescribed to C.D. because as of the trial, Stitt had not taken C.D. to see a pediatrician and the IAT process had only begun two weeks before. As the trial court found, the school notified Stitt that C.D. might have ADD in November. Stitt also received many notes regarding C.D.'s issues with focusing in class. Sommers testified that Stitt did not attend the IAT meeting that was scheduled to discuss C.D.'s focusing issues and did not notify her or give an explanation of why she could not attend. Stitt claimed she was ill and that she sent a note to the school. Furthermore, Sommers testified that Stitt told her she was going to discuss the focusing issues with C.D.'s doctor, which Stitt did not do. Thus, the record supports the trial court's findings on C.D.'s health issues as a change in circumstances.

**{¶56}** Second, as to educational issues, the trial court discussed C.D.'s poor academic performance. It noted that C.D. repeated kindergarten, was absent 20 times in her second year of kindergarten, is now failing first grade, and has been written up multiple times for behavioral issues. The court noted that Stitt has missed two conferences and has not volunteered with C.D.'s class. Stitt made up the conferences but brought her boyfriend to the second conference, and Sommers testified that he was disruptive to the process. The court noted that Stitt hired a tutor for C.D. briefly and that Daugherty did not approve because he believed Stitt should be able to help C.D. with her homework. The court found that Stitt's claims that she helps C.D. with her homework all the time were not credible based upon the amount of time the child spends with her grandmother after school.

**{¶57}** The court also discussed Daugherty and Rhonda's involvement with C.D.'s education. It noted that at least one of them was at every conference and school activity. It pointed out that Daugherty sought guidance from the teacher on what study aids to use

with C.D. Daugherty and Rhonda testified that they help C.D. with her homework on the weekends, and C.D. corroborated this testimony by expressing her displeasure that Daugherty makes her do her homework.

**{¶58}** Stitt notes that the trial court cited to *Paparodis v. Paparodis*, 7th Dist. No. 88 C.A. 119, 1989 WL 27777 (Mar. 23, 1989), to support its finding of a change in circumstances based on C.D.'s academic problems and Daugherty's ability to provide a better educational environment. Stitt contends that the evidence does not support this conclusion, and unlike in *Paparodis*, both parents have put forth substantial effort in assisting C.D. with her education.

**{¶59}** In *Paparodis*, this court found that there was evidence in the record to support the trial court's finding that the child's schooling was very poor in their mother's custody. The testimony showed that the child had missed over half the days of the school year, should have received all unsatisfactory grades on her report card, and the mother did not have the child tested for a learning disability until two months after the father filed a motion for a change of custody. *Id.* at *2. Here, as the trial court noted, the record contains similar evidence of C.D.'s educational problems. Furthermore, the record also supports the conclusion that Daugherty can offer a better educational environment. The record reveals that Daugherty and Rhonda were involved with C.D.'s schooling by assisting her with homework, purchasing study aids for her, and volunteering at her school. While Stitt claims that C.D.'s grades have not improved despite Daugherty's assistance, Daugherty and Rhonda were usually only able to help C.D. on the weekends. Moreover, the court did not believe Stitt's testimony that she assisted C.D. with her homework all the time, and again, the trial court was in the best position to judge Stitt's credibility. *Rohrbaugh* at 607. Accordingly, the record supports the trial court's finding of a change in circumstances based on C.D.'s education.

**{¶60}** Third, as to household composition, the trial court found that there was ample testimony that various men and women had moved in and out of Stitt's residence in the last several years. In response, Stitt contends that the change in circumstances must relate to facts that have arisen since the prior decree or that were unknown to the

court at the time of the prior decree. She contends that the evidence shows that this pattern of roommates has occurred for the last several years and Daugherty, the moving party, did not demonstrate that this was not the case from the time of the prior court decree.

**{¶61}** As the trial court found, the record contains evidence of men and women moving in and out of Stitt's residence over the last several years. Stitt testified that she was living in her current residence in 2004 when the trial court issued the prior decree. She further testified that she had a boyfriend living with her and C.D. in 2004 through 2008. The remainder of the testimony described people living in Stitt's home from 2008 on, which supports the trial court's conclusion that there was a pattern of people moving in and out over the last several years. Although there was no evidence regarding Stitt's living situation prior to 2004, at the time of the prior decree, C.D. was only a year and a half old. The evidence of roommates moving in and out over the last three years coupled with C.D.'s age supports the trial court's finding of a change of circumstances based on household composition.

**{¶62}** The trial court did not abuse its discretion in finding a change in circumstances had occurred. Accordingly, this assignment of error is meritless.

### Reallocation of Custody

**{¶63}** In her last assignment of error, Stitt argues:

**{¶64}** "The trial court's decision to grant a change of custody is an abuse of discretion and against the manifest weight of the evidence."

**{¶65}** Stitt focuses on the trial court's best interest analysis, and claims error with regard to several aspects of the trial court's analysis. Each argument will be discussed in turn.

**{¶66}** R.C. 3109.04(F)(1) sets forth factors the trial court must consider when determining who should be the minor child's residential parent:

(F)(1) In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities

for the care of children or a modification of a decree allocating those rights and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

* * *

**{¶67}** Initially, Stitt notes that the trial court erroneously considered R.C. 3109.04(F)(2), which sets forth factors for the court to consider when determining whether shared parenting is in the best interest of the minor child. Shared parenting was not at issue in this case, so it is unclear why the court cited to this provision. However, in its analysis, the court discusses the in-camera interview it conducted with C.D. The child's wishes and concerns expressed during an in-camera interview are a factor for the court to consider under R.C. 3109.04(F)(1)(b). "[A]n appellate court will not reverse a correct judgment merely because a lower court assigned erroneous reasons as the basis of the judgment." *Van-Am. Ins. Co. v. Schiappa*, 132 Ohio App.3d 325, 333, 724 N.E.2d 1232 (7th Dist. 1999). Thus, because the trial court's analysis was proper under R.C. 3109.04(F)(1)(b), this argument is meritless.

**{¶68}** Stitt further argues that the trial court inappropriately discounted the wishes

expressed by C.D. during the in-camera interview. The trial court found that C.D. wished to remain with Stitt and had nothing positive to say about Daugherty. The trial court found the interview was so "lopsided" that it believed Stitt may have coached C.D. on what to say. The court noted that C.D. had knowledge of adult matters she should not have known about. The court also noted that C.D.'s main complaint against Daugherty was that he had rules at his house; whereas, Stitt did not have any rules for her to follow. Thus, the court stated it was discounting C.D.'s preference. Because the trial court determined that C.D.'s answers appeared coached and her wishes based upon whether she had to follow rules at each parent's house, the trial court did not abuse it's discretion in not giving weight to C.D.'s preference. *See Meaney v. Meaney*, 11th Dist. No. 2009-L-050, 2010-Ohio-1969, ¶ 46.

**{¶69}** Next. Stitt contends that it was error for the trial court to fail to consider C.D.'s interaction with Stitt under R.C. 3109.04(F)(1)(c). Stitt cites to *In re Jeffreys*, 7th Dist. No. 01-BA-4, 2002-Ohio-703. In *In re Jeffreys*, this court remanded a custody case for the trial court to consider the statutory best interest factors where the trial court's judgment did not mention any of these factors. This court noted that it has "generally relied on the presumption of correctness that adheres to a trial court's decision, and has accepted that the trial court considered the relevant factors unless the record clearly shows otherwise." *Id.* at 7. However, the record did not show that the trial court in *In re Jeffreys* sufficiently considered the factors in R.C. 3109.04(F)(1). *Id.* at 7-8.

**{¶70}** Here, the trial court's analysis of the best interest factors was thorough; the court listed each factor individually and explained its analysis under each. It is true that the court focused its analysis under R.C. 3109.04(F)(1)(c) on C.D.'s interaction with Daugherty rather than Stitt; however, when considering the court's analysis as a whole, the record demonstrates that the trial court sufficiently considered the relevant statutory factors.

**{¶71}** Stitt also contends that the trial court's consideration of the interaction between Daugherty and Stitt's boyfriend was inappropriate. However, R.C. 3109.04(F)(1)(c) instructs the court to consider the child's "interaction and

interrelationship" with "any other person who may significantly affect the child's best interest." The court was concerned that the boyfriend's negative view of Daugherty and his attempts to take on an "exclusive male parental role" would affect C.D.'s relationship with Daugherty. Thus, the court properly considered the boyfriend's role in C.D.'s life as a factor that may affect her best interest.

**{¶72}** Stitt argues that the trial court improperly considered Campise and Scuken's allegations regarding a lack of adequate housing under R.C. 3109.04(F)(1)(d). Stitt challenges their credibility by noting that both were subject to civil protection orders to stay away from Stitt. However, although the existence of the civil protection orders negatively affects Campise and Scuken's credibility, the trial court decided to consider these witnesses' testimony. "A reviewing court will not second-guess weight and credibility determinations made by the trier of fact." *In re Jeffreys* at 5, citing *C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), at syllabus. Furthermore, Campise and Scuken's testimony was bolstered by Fulton who testified that Stitt's home was not clean when she moved in with Stitt in November 2008 and that Stitt had issues with heat and water.

**{¶73}** Stitt also objects to the trial court's consideration of C.D.'s dental issues and potential ADD diagnosis under R.C. 3109.04(F)(1)(e). As discussed above, there is competent, credible evidence in the record supporting the trial court's findings on these issues. The trial court also mentioned that C.D. had multiple cases of head lice without attributing a cause to this problem. The statute directs the trial court to consider the physical health of all involved parties; thus, it was not error for the trial court to note C.D.'s cases of head lice.

**{¶74}** Finally, Stitt argues that the trial court's mention that Stitt does not have a vehicle but Daugherty and Rhonda own vehicles shows that the trial court impermissibly gave preference to Daugherty due to his financial status. R.C. 3109.04(F)(3) instructs that when allocating parental rights, a trial court should not give preference to a parent due to that parent's financial condition. In its judgment entry, the trial court stated that it did not take into account the parties' financial status in accordance with the statute. In its

discussion of the advantages of a change of environment outweighing the harm, the court stated: "[A]s the Defendant and his wife have vehicles, they can provide for the minor child's health and academic needs in a timelier manner."

**{¶75}** While Stitt argues that there was no evidence of transportation issues in the record and therefore no reason to mention that Daugherty has a vehicle, the record reveals that C.D. missed many days of school and that she had multiple cavities despite Stitt's claim that she took C.D. to regular dental appointments. Stitt also admitted that she was not always able to get C.D. to the bus stop because she does not have a vehicle. The court's mention of Daugherty and Rhonda's vehicles was in reference to the court's belief that they would allow Daugherty to better provide for C.D.'s health and academic needs. This comment was one part of a discussion of Stitt's lack of structure and the advantages of changing custody to Daugherty due to his ability to provide better structure and to assist in C.D.'s educational needs. Thus, the trial court did not give preference to Daugherty based on his financial condition.

**{¶76}** Considering the court's analysis in whole, the trial court did not err in its determination of the best interest factors. The trial court's analysis was detailed, its findings were supported by evidence in the record, and the trial court appropriately judged the weight and credibility of the evidence. After its analysis of the best interest factors, the court made a reasoned determination that a modification of custody was in C.D.'s best interest, and the advantages of a change of residence to Daugherty would outweigh the likely harm caused by this change.

**{¶77}** Thus, the trial court did not abuse its discretion in granting the change of custody and its decision was not against the manifest weight of the evidence. Accordingly, this assignment of error is meritless.

### Conclusion

**{¶78}** In sum, Stitt's arguments are meritless. The trial court granted custody to Daugherty, the child's father, and Stitt has not provided any caselaw to support her argument that the stepmother has become the de facto custodial parent. A review of the record reveals that Stitt had a sufficient opportunity to request a guardian ad litem, but

she failed to do so. Furthermore, the trial court did not abuse its discretion in finding a change of circumstances had occurred. Finally, the trial court did not err in reallocating custody; the trial court's judgment was well-reasoned and supported by competent, credible evidence. Accordingly, the judgment of the trial court is affirmed.

Waite, P.J., concurs.

Vukovich, J., concurs.